IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY HUDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 11 C 4948 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Anthony Hudson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Mr. Hudson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Mr. Hudson applied for DIB and SSI on August 8, 2007, alleging that he had become disabled on December 31, 2001. (Administrative Record ("R.") 187-93). His application was denied initially and upon reconsideration. (R. 117-24, 135-44). Mr. Hudson continued pursuit of his claim by filing a timely request for hearing. (R. 147-151).

An administrative law judge ("ALJ") convened a hearing on December 10, 2009, at which Mr. Hudson, represented by counsel, appeared and testified. (R. 37-116). In

addition, Mr. Hudson's sister testified, along with Pamela Tucker – a vocational expert – and Dr. Sheldon Slodki – a medical expert. (R. 37). On June 18, 2010, the ALJ issued a decision finding that Mr. Hudson was not disabled because he retained the capacity to perform a limited range of simple, repetitive sedentary work, and that this allowed him to do jobs that existed in significant numbers in the regional economy. (R. 15-25). This became the final decision of the Commissioner when the Appeals Council denied Mr. Hudson' request for review of the decision on May 26, 2011. (R. 1-7). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Hudson has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### Vocational Evidence

Mr. Hudson was born on November 22, 1962, making him thirty-nine years old as of his alleged onset of disability. (R. 23). He has limited education, but can communicate in English. (R. 23). Mr. Hudson's work history includes stints as a cleaner, cashier, roofer's helper, and industrial truck operator. (R. 23). He explained that he always tried to keep a job because he needed one to survive, but he had to stop working because his body was breaking down. (R. 58).

### B.
### Medical Evidence

Mr. Hudson has a host of medical problems and has sought and received a great deal of treatment. Consequently, the record in this case is a lengthy one: about 800

pages. But, the parties rely on just a small sampling of those documents to support their positions.

Mr. Hudson is a diabetic who treats with insulin. Records of his trips to the hospital reveal that he suffers from a number of attendant symptoms and consequences of the disease, including fatigue, numbness and pain in his feet, and blurred vision on occasion. He also has some hearing loss and experiences shortness of breath on exertion.

From June 28, 2005, to July 1, 2005, Mr. Hudson was hospitalized for abdominal pain and for uncontrolled diabetes mellitus. He had not been taking his insulin properly. (R. 360-362). He was diagnosed with type 1 diabetes mellitus, with no evidence of diabetic ketoacidosis; and diabetic peripheral neuropathy. He had markedly decreased sensation in his feet, and decreased pulses in his right leg. (R. 370). He was treated with insulin and released.

On September 20, 2005, Mr. Hudson returned to the hospital with complaints of fatigue and foot pain and swelling that had persisted for months but were then worse. (R. 466). Mr. Hudson was again diagnosed with hyperglycemia and uncontrolled diabetes mellitus at that time. (R. 466). Again, he was treated with insulin.

On November 10, 2006, Mr. Hudson visited Dr. Kumar Raigaga, complaining that his feet were tingling, numb, and itching. (R. 503). Sharp sensations were significantly decreased in his feet; gait was stable. Dr. Raigaga's diagnosis was controlled diabetes mellitus, type II, with neurological manifestations. (R. 503).

On March 16, 2007, an x-ray of Mr. Hudson's hips showed only "mild" osteo-arthritic changes bilaterally. (R. 387). Glucose was elevated at 148, but albumin, protein, and hematocrit levels were low. (R. 384).

On August 14, 2007, and on August 21, 2007, Mr. Hudson made trips to the emergency room complaining of nausea, vomiting, and blurry eye sight. (R. 336). On the earlier visit, appropriate diagnostic imaging showed no radiographic evidence of acute cardiopulmonary disease. Glucose was significantly elevated at 239; creatine kinase and bilirubin were high, while albumin was low. (R. 393-94). On the later visit, Mr. Hudson's EKG was normal, but he was said to have a high probability of coronary artery disease. (R. 344). He was suffering from fatigue and neuropathy as well, and a needles and pins sensation in his feet. (R. 344). Hemoglobin, hematocrit, RBC count, and monocyte were all low. (R. 412). A CT scan of the claimant's chest showed no evidence of a pulmonary embolism. (R. 353). A stress test showed no definite reversible or fixed myocardial perfusion defect; and a left ventricular ejection fraction of 52%. (R. 354). Mr. Hudson also had an essentially normal echocardiographic study, and an adenosine stress ECG was negative for ischemia. (R. 355-56).

On September 10, 2007, Dr. Barbara Semakula treated Mr. Hudson at the medical center for complaints of foot pain and cough. (R. 410). She said Mr. Hudson's diabetes was stable and he was compliant with medication, but he was still suffering from blurred vision, chest pain, and numbness/tingling. (R. 410). The doctor diagnosed diabetes mellitus, uncontrolled, with neuropathy, and bronchitis. (R. 411).

On September 24, 2007, a bilateral lower extremity arterial doppler ultrasound showed "mild" atherosclerosis of the claimant's lower extremities, without doppler evidence of hemodynamically significant in-flow diameter stenosis of the common-external iliac arteries or focal diameter stenosis of the superficial femoral arteries. (R. 572).

On October 4, 2007, Dr. Reynaldo Gotanco, reviewed the medical evidence on behalf of the state disability agency. He noted that Mr. Hudson had diabetes mellitus with neuropathy. Dr. Gotanco felt Mr. Hudson was capable of: occasionally lifting 20 pounds; frequently lifting 10 pounds; standing and/or walking for at least two hours in an 8-hour workday; sitting for about 6 hours in an 8-hour workday; and unlimited pushing and/or pulling, other than as shown for the lift and/or carry restrictions. The doctor stated that Mr. Hudson could occasionally climb ramps and stairs; climb ladders, ropes, and scaffolds; and balance. He could perform all other postural activities frequently. Dr. Gotanco stated that Mr. Hudson had no manipulative, visual, communicative, or environmental limitations. (R. 542-48).

On October 16, 2007, Dr. Semakula stated that Mr. Hudson had a hearing impairment that also impaired his balance. Because of this, Dr. Semakula said that he was "able to perform limited duties." (R. 720). On October 26, 2007, a chest x-ray showed no acute cardiopulmonary abnormalities. (R. 645). A CT scan of the chest on December 4, 2007, was negative for a pulmonary embolism. (R. 614). On December 5, 2007, ultrasound showed no significant atherosclerotic disease. (R. 620).

Mr. Hudson's asthma was acting up on January 7, 2008, and he made another visit to the hospital. (R. 576). There was also tenderness and swelling in his feet. (R. 575-76). X-rays showed a normal heart size; pulmonary vascularity that was within normal limits; and no pulmonary infiltrate or pneumothorax. (R. 579). ECG was normal. (R. 593). Hemoglobin, hematocrit, and RBC count were again low. (R. 595).

On February 20, 2008, the Dr. Ragil Patel completed a Diabetes Mellitus Residual Functional Capacity Questionnaire provided by Mr. Hudson's attorney. Dr.

Patel explained that he first saw Mr. Hudson just five months earlier, in September 2007. He noted that Mr. Hudson suffered from several symptoms, including fatigue, general malaise, numbness, swelling, and dizziness. Dr. Patel opined that Mr. Hudson could only walk one city block without rest, could only sit for 30 minutes at one time, and could only stand for 15 minutes at one time. He stated that Mr. Hudson could stand/walk for less than 2 hours and could sit for about 4 hours in an 8-hour working day. Mr. Hudson needed a job that permitted him to shift positions at will from sitting, standing, or walking, and to sometimes take unscheduled breaks during an 8-hour working day. Mr. Hudson did not have to elevate his legs during the workday, but he needed a cane for standing and walking. Mr. Hudson did not have any significant limitations in reaching, handling, or fingering, but could only rarely lift less than 10 pounds. Dr. Patel felt Mr. Hudson would miss about one day per month due to his impairments or their treatments. (R. 690-93).

On April 1, 2008, Mr. Hudson's eye doctor noted that he had visual acuity of 20/25 in both eyes without correction. Mr. Hudson had diabetic retinopathy and macular edema, but there were no abnormalities or limitations in his fields of vision, and the prognosis for both eyes was good. Mr. Hudson's vision would not be further impaired by prolonged or occasional reading, stretching, lifting, or irritants. (R. 654-55, 703).

On April 6, 2008, Dr. Dino Delicata reported that audiological testing revealed that Mr. Hudson had mild to severe hearing loss in both ears with poor word recognition even when speech was amplified. With hearing aids, functional gain was only fair. (R. 657).

On April 17, 2008, Dr. Frank Jimenez reviewed the medical record on behalf of the State disability agency. Dr. Jiminez stated that Mr. Hudson was capable of performing light work, as long as it did not involve climbing ladders, ropes, or scaffolds. He could only occasionally perform all other postural activities. The doctor found Mr. Hudson had no manipulative or visual limitations. The claimant was limited in his hearing, and should avoid working in areas that had more than moderate noise intensity levels. Further, Dr. Jimenez noted that Mr. Hudson should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 708-15).

## C.
### The Administrative Hearing Testimony

#### 1.
#### The Plaintiff's Testimony

At his hearing, Mr. Hudson said that he had difficulty doing his jobs due to side effects from his diabetes. (R. 56). Sometimes his supervisors would work around this, but at one job he was terminated because he couldn't keep up. (R. 57). By December of 2001, he stopped working because his body was "just shutting down" on him. (R. 58).

Mr. Hudson gave himself his insulin shots unless he wasn't feeling good and was having trouble seeing the needle. (R. 60). He has been on insulin since the early nineties. (R. 61). He previously lived with his fiancé, who was out of work. When she was working, when he was home alone, a neighbor would check on him. (R. 60). In the morning, Mr. Hudson showered and his fiancé fixed breakfast. Thereafter, he would generally watch TV or listen to the radio, and take a little walk around the house outside. (R. 62). If he feels good, he can vacuum, but if he stands too long – say, washing the

dishes – he gets dizzy.  (R. 63).  Mr. Hudson explained that he has fallen quite often.  (R. 64).  He uses a cane to help him maintain his balance.  (R. 65).

Mr. Hudson testified that he had a hard time grasping instructions.  (R. 65).  He also said that he had some hearing loss in both ears, and could understand people better if he was looking right at them when they spoke.  (R. 43).  It had been years since he wore hearing aids, though.  (R. 43). At the time of the hearing, he hadn't worked in eight years.  (R. 53).  He had no income, and was not on public assistance or medicaid, so he couldn't afford them.  (R. 65).

## 2.
## Plaintiff's Sister's Testimony

Ms. Stokes testified that she helped her brother by cooking, and her husband helped him with showering and bathing.  (R. 77).  She had moved back from Atlanta to take care of him because they had no other family.  (R. 80).  His nieces and nephews and fiancé also helped out.  (R. 77).  Her brother went to special education classes throughout school.  (R. 78).  She said his doctor indicated that he should discontinue his driver's license due to the numbness in his feet.  (R. 79).  She also said that, due to his blood sugar, she noticed her brother suffered "space outs" two to three times a month.  (R. 84-85).  In addition to insulin, Mr. Hudson took Advair and Singulair for asthma, and Lisinopril for blood pressure.  (R. 86-87).  He also took something for his neuropathy.  (R. 88).

## 3.
## The Medical Expert's Testimony

Dr. Slodki clarified that Mr. Hudson was taking insulin, Singulair, Albuterol, Advair, Lisinopril, Neurotonin, Metformin, and Tylenol.  (R. 91).  He did not have an

impairment that met a listing. (R. 48-51). The doctor opined that Mr. Hudson could sustain sedentary activity for 8 hours a day, 40 hours a week. (R. 94). There was nothing in the record that led Dr. Slodki to believe that Mr. Hudson would "space out" at work a number of times a day. (R. 95).

**4.**
**The Vocational Expert's Testimony**

Ms. Tucker testified that Mr. Hudson's past work ranged from unskilled and light (cashier) to medium and semiskilled (industrial truck operator) to very heavy and unskilled (roofer helper). (R. 98). The ALJ asked whether a person who could lift 10 pounds frequently and 20 pounds occasionally, stand or walk 2 hours and sit 6 hours, and could occasionally balance and climb ramps, stairs, ladders, ramps, or scaffold could perform any of Mr. Hudson's past work. The VE said no. (R. 98-99). If the same person had to use a cane to stand or walk, he could perform jobs like checker/inspector, of which there were 400 positions in the region, assembler (1800 positions), bench worker (900 positions). (R. 101-02). If the person had additional environmental restriction like avoiding dust, fumes, or poor ventilation, that would reduce the number of assembler and bench worker positions to 1000 and 700. (R. 103). If the person were further limited to sedentary work, he could still handle those jobs. (R. 105). The person could also perform 1600 machine operator positions. (R. 105). An additional restriction to simple, routine, and repetitive task requiring only occasional decision-making were added, the person could still perform such jobs. (R. 104). If the same person had to stand up frequently – a sit/stand option – while employing his cane, it would eliminate these positions because both hands would not be free. (R. 114-15).

# D.
# ALJ's Decision

The ALJ began by finding that Mr. Hudson had not engaged in substantial gainful activity since his alleged onset date. (R. 17). She then found that Mr. Hudson suffered from the following severe impairments: diabetes mellitus with associate peripheral neuropathy in the lower extremities, hearing loss, and asthma. (R. 17). The ALJ concluded that Mr. Hudson did not have an impairment or combination of impairments that met or equaled a listed impairment. She based this result on her own review and the testimony of the medical expert. (R. 17).

The ALJ next decided that, despite his impairments, Mr. Hudson could perform a very limited range of sedentary work, specifically:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that: [Mr. Hudson] should never climb ladders, ropes, or scaffolds; [Mr. Hudson] should only occasionally climb stairs and ramps; Mr. Hudson should only occasionally balance, but with a hand-held assistive device; [Mr. Hudson] should only occasionally use foot pedals/controls; [Mr. Hudson] should avoid concentrated exposure to unprotected heights; [Mr. Hudson] should avoid concentrated exposure to odors, environmental irritants, and poorly ventilated areas; and [Mr. Hudson] should be able to use a cane to walk and stand. From a mental residual functional capacity perspective, [Mr. Hudson] should do simple, routine, and repetitive tasks and should be in a job with only occasional decision-making and with only occasional changes in the work setting.

(R. 18). Based on the objective medical evidence, the ALJ determined that Mr. Hudson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 19). The ALJ then summarized the medical record and made note of the medical expert's opinion that Mr. Hudson could

perform sedentary work. (R. 19-22). In terms of the other medical opinions in the record, the ALJ assigned varying degrees of weight to them based on their consistency with the medical record. (R. 21-22).

Finally, the ALJ considered Mr. Hudson's age, education and work experience. She noted that, if he had a capacity for a full range of sedentary work, the Medical-Vocational Guidelines would direct a finding of "not disabled." (R. 24). She then relied on the testimony of the VE to find that Mr. Hudson could perform work that existed in significant numbers in the regional economy and was, therefore, not disabled under the Act. (R. 21).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the

court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**
**Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that Mr. Hudson is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that Mr. Hudson is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. Mr. Hudson bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Mr. Hudson submits that there are several problems with the ALJ's decision. Essentially, the problems here are with the ALJ's assessment of Mr. Hudson's credibility and her treatment of the opinions of his treating physicians.

In evaluating Mr. Hudson's credibility, the ALJ employed the boilerplate that is chronic (and analytically incorrect), notwithstanding the Seventh Circuit's constant denunciation of the formula in these cases:

> I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 19). Essentially, the ALJ determined what she thought Mr. Hudson could do, and then found incredible all his allegations that were incompatible with that determination. The Seventh Circuit has resoundingly – and repeatedly – disapproved of this language, because it puts "the cart before the horse, in the sense that the determination of capacity

13

must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012); *Roddy v. Astrue*, 705 F.3d 631, 635 (7th Cir. 2013); *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012); *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010). But the boilerplate itself is not fatal if the ALJ supports her finding with additional reasons such as contradictory medical evidence. *Filus*, 694 F.3d at 868; *Shideler v. Astrue,* 688 F.3d 306, 311–12 (7th Cir. 2012).

Here, the ALJ's only reason for not believing Mr. Hudson's complaints was the medical evidence. That's one factor an ALJ should consider when assessing a claimant's credibility, *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), because "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005). But an ALJ cannot simply disregard a claimant's allegations of symptoms solely because their intensity is not substantiated by the medical evidence. SSR 96–7p(4); *Bjornson,* 671 F.3d at 646; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006). Objective medical evidence is not essential. *Mueller v. Astrue*, 493 Fed.Appx. 772, 777 (7th Cir. 2012). An ALJ must also consider factors such as daily activities and medication regimen. *Filus*, 694 F.3d at 869 (7th Cir. 2012); *Simila*, 573 F.3d at 517. The ALJ here was content with looking at the objective medical evidence alone.

The ALJ made no mention of Mr. Hudson's daily activities, which are minimal. He does not prepare his own meals. He cannot shower on his own. Someone has to check on him, especially to see if he is taking his insulin. The record is replete with

instances where he has required treatment because he either forgot to take it or ran out. He watches TV and walks around the outside of the house. He tired easily and was unable to complete tasks like vacuuming or even washing dishes. For a time his fiancé kept tabs on him. When she was out, she had a neighbor check on him. Eventually his sister and her family moved here from Atlanta to take care of him. Now, he has a support group that includes his sister and her husband, and nieces and nephews. It doesn't strike one as a portrait of someone who can hold down a job eight hours a day, five days a week. In fact, Mr. Hudson's testimony about his daily activities seems to jibe with how he struggled at work before he finally gave up.

It was inappropriate for the ALJ to have ignored the manner in which Mr. Hudson lived from day to day. This is especially so where the claimant's daily activities are so restricted. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)(ALJ failed to acknowledge that claimant struggled to complete even the simplest and least strenuous of tasks); *Chase v. Astrue*, 458 Fed.Appx. 553, 557-58 (7th Cir. 2012)(ALJ failed to address claimant's testimony about his inability to simple chores). *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008)("[Claimant's] so-called 'daily walk' was merely to the mailbox at the end of the driveway, his vacuuming took only four minutes, and his grocery shopping was done on a motorized cart at the store . . . ."). A complete credibility analysis accounts for the claimant's allegations about how his symptoms affect his daily activities. *Eakin v. Astrue*, 432 Fed.Appx. 607, 613 (7th Cir. 2011); *Martinez v. Astrue,* 630 F.3d 693, 697 (7th Cir.2011). The ALJ did not perform the complete analysis required here.

Similarly, the ALJ didn't consider the array of medications Mr. Hudson was on. In addition to insulin shots – when he remembered and when his vision wasn't too blurry

to see the needle – he took Singulair, Albuterol, Advair, Lisinopril, Neurotonin, Metformin, and Tylenol. Hearing tests indicate that he really ought to be using hearing aids in both ears, but could not afford them. He also needs a cane. At some, point, with physicians prescribing all this, the suggestion is, where there's smoke there's fire. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)("improbab[le] that this host of medical workers would prescribe drugs and other treatment for [claimant] if they thought [he] were faking h[is] symptoms."). The ALJ's failure to take this into consideration further undermines her credibility determination.

That's enough to require a remand but, there are even some flaws in the ALJ's use of the objective medical evidence to discredit Mr. Hudson. For example, the ALJ discounted Mr. Hudson's allegations of blurry vision because his eye doctor said his vision would not be adversely affected by reading, stretching, lifting, or irritants. (R. 21). But that's not the same as saying Mr. Hudson would be able to work despite his retinopathy and macular edema. The ALJ also seemed to think that because Mr. Hudson tested at 20/25 that particular day, he was lying about his blurred vision. (R. 21). Mr. Hudson didn't claim his vison was always blurry, however, and with his condition it wouldn't necessarily be. His treating physician, Dr. Patel, said it was "episodic." Dr. Slodki, the medical expert, explained how it worked at the hearing:

> He has had laser treatments for the macular edema and retinopathy, so he has intermittent – and when the diabetics – all diabetics have variation in visual acuity related to their blood sugar fluctuation. That's, that's not – that usually doesn't influence their visual acuity at the time of an examination, but it can cause variations in visual acuity and, and, actually, modify their refraction.

(R. 48). So one eye exam on one day does not provide a valid reason to disbelieve Mr. Hudson's claims that his vison gets blurry from time to time. Moreover, that's the

16

testimony of the "independent medical expert," whom the ALJ found "credibly testified at the hearing" and upon whom the ALJ relied for her residual functional capacity finding. Yet, the ALJ made no mention of intermittent blurred vison in her residual functional capacity finding or her hypotheticals to the VE.

Then there is Mr. Hudson's hearing loss. The ALJ apparently believed Mr. Hudson had a significant hearing loss, and said she was accounting for it – and his "allegedly low I.Q." – by limiting Mr. Hudson to "simple, routine, and repetitive tasks" and jobs "with only occasional decision-making and with only occasional changes in the work setting." (R. 20). One can arguably follow how these restrictions might stem from a low I.Q. – more on that later – but it's not so easy to trace the path of the ALJ's reasoning from hearing loss to simple work. Supposedly, it has to do with Mr. Hudson's inability to hear instructions. Perhaps the ALJ is envisioning a situation where Mr. Hudson has to have things repeated over and over? Maybe the fact that the work is simple means the instructions will be brief and it will take up less of the workday reiterating them? *See* 20 CFR §404.1568(a). It's left unexplained. And, as such, it smacks of the line of case where the Seventh Circuit has disapproved of ALJs limiting claimants with deficiencies in carrying out instructions to simple or unskilled work. *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir.2010).

Returning to Mr. Hudson's low I.Q., it seems that the ALJ overstepped her bounds. She gave the impression that she was giving Mr. Hudson the benefit of the doubt and throwing in some I.Q.-related restrictions even though there was no medical evidence to back them up. But that diagnosis is not within an ALJ's purview. *Richards*

*v. Astrue*, 370 Fed.Appx. 727, 730 (7th Cir. 2010); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009); *Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir.2009). If the ALJ suspected there was an intelligence level problem, she should have ordered a consultative examination to determine its extent. Then she would be required to have evaluated the evidence using the proper procedure, known as the "special technique." *Richards v. Astrue*, 370 Fed.Appx. 727, 730 (7th Cir. 2010)(remanding case where ALJ "rated [claimant's] mental functional limitations without the benefit of any medical professional's assessment of her mental RFC" and failed to employ the special technique).

The plaintiff has some additional concerns regarding the ALJ's opinion but, as the foregoing problems already necessitate a remand, those will not be addressed.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#15] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/30/13